

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

FILED
2014 MAY 21  AM 10: 33
CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____ DEPUTY

MANNY MORALES
INDIVIDUALLY, AND
LOURDES MORALES,
REPRESENTATIVE OF THE
ESTATE OF BERNIE MORALES,
DECEASED,
   **Plaintiffs,**

vs.

ALBERT GOMEZ, JOHN DOES 1-20,
AND THE CITY OF EL PASO,
   **Defendants.**

§
§
§
§
§
§
§
§
§
§
§
§

JUDGE FRANK MONTALVO

CIVIL ACTION NO. _____

**EP14 CV0189**

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Manny Morales, Individually, and Lourdes Morales, as Representative of the Estate of Bernie Morales file this action against Officer Albert Gomez, John Does 1-20, and the City of El Paso ("**Defendants**") for the violation of Plaintiffs' civil rights.

## PARTIES AND SERVICE

1.   Plaintiff Manny Morales is a citizen of the United States, the State of Texas, and a resident of El Paso County, Texas.

2.   Bernie Morales, Deceased, was a citizen of the United States, the State of Texas, and a resident of El Paso County, Texas on the date of his death.

3.   Defendant Officer Albert Gomez, Badge No. 2076, may be served with process at his place of employment at The El Paso Police Department Police Headquarters, 911 N. Raynor, El Paso, Texas 79903.

4.   Defendant City of El Paso may be served with process by serving the El Paso City Manager, Joyce A. Wilson, 300 N. Campbell, El Paso, Texas 79901.

## JURISIDCTION

5.      The action arises under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and Title 42 U.S.C. §§ 1983 and 1988.

6.      This Court has jurisdiction under these claims pursuant to Title 28 U.S.C. §§ 1331 and 1343.

## VENUE

7.      Venue is proper pursuant to Title 28 U.S.C. § 1391(b)(1) in that the Defendant resides and the cause of action arises in the Western District of Texas, El Paso Division.

## NATURE OF ACTION

8.      This is an action to recover for violations of the Plaintiffs' constitutional rights and/or privileges or immunities guaranteed under the Fourth and Fourteenth Amendments to the United States Constitution and Title 42 U.S.C. §§ 1983 and 1988.

## CONDITIONS AND PRECEDENTS

9.      All conditions precedent to jurisdiction have occurred or been complied with.

## FACTS

### OFFICER SHOOTS BERNIE MORALES WITH HIS HANDS IN THE AIR

10.      On June 15, 2012, at about 8:01 a.m., Bernie Morales was walking along a canal that runs along the 8400 block of Alameda.

11.      That morning was sunny, and there was clear daylight.

12.      Bernie wanted to pick or gather pecans from the trees lining the canal and in the surrounding neighborhood, and asked for permission from resident Larry Davis whose property was nearby.  Davis readily consented, but called the police, because officers had been in the area days before looking for an individual suspected of violating his parole.

13.     Officer Albert Gomez of the El Paso Police Department was dispatched to the canal area.

14.     Defendant Gomez was in full uniform, and drove his marked patrol unit to the area where Bernie had been walking.

15.     Defendant Gomez drove along a dirt path that that runs parallel to the canal.

16.     Defendant Gomez located Bernie walking along the opposite side of the canal.

17.     Defendant Gomez followed Bernie up the road.

18.     Bernie then crossed the canal.

19.     Defendant Gomez exited his patrol car, and crossed a concrete bridge that spans the canal.

20.     Defendant Gomez and Bernie were then walking along the same side of the canal, and traveling in the same direction.

21.     While standing a distance of approximately 20 yards or more, Defendant yelled to Bernie that he wanted to talk to him, and told him to stop.

22.     Bernie turned around, and raised both of his hands in the air, and walked toward Defendant Gomez.

23.     Bernie continues to walk toward Defendant with his hands in the air.

24.     Defendant Gomez then shoots Bernie in the chest with his firearm.

25.     At the time of the shooting, Bernie had his hands in the air, was not brandishing any weapon, and was surrendering to Defendant Gomez.

26.     When Bernie is shot, he falls to the ground.

27.     Thereafter, Bernie does not receive timely medical treatment.

28.     Dr. Juan Contin of the Office of the Medical Examiner and Forensic Laboratory

for the County of El Paso ruled that the manner of Bernie's death was a homicide.

29.    Dr. Contin also determined that the cause of death was "[b]leeding due to gunshot wound to chest."

### FAMILY MAKES COUNTLESS INQUIRIES WITH THE POLICE AND THE EL PASO COUNTY DISTRICT ATTORNEYS' OFFICE

30.    Early after the incident, the family inquired with Internal Affairs Division of the El Paso Police Department, and the El Paso District Attorneys' Office.

31.    The family was informed that the shooting would be submitted to District Attorneys' Office, and presented to a grand jury.  Over the next year, nothing occurred, despite countless phone calls by family members.

32.    Bernie's brother Ramon Morales called countless times from October, 2012 until November, 2013.  Morales kept detailed notes, and was told for months that the case was still under review.

33.    Ramon was likewise told in September, 2013 that the shooting matter would be presented to the grand jury in October, 2013.  On October 17, he was then told it would be two to three weeks later.

34.    The matter was not presented to a grand jury until April, 2014.

### FAMILY GETS FRUSTRATED WITH GETTING THE RUNAROUND AND HIRES AN INDEPENDENT INVESTIGATOR

35.    Disturbed by receiving no answers about the shooting, the family hired a private investigator to conduct an independent investigation.

36.    The family hired Roy Davis, Jr. and his firm Advocate Services, Inc.

37.    Chief Investigator Davis is a peace officer in good standing with the Texas

Commission on Law Enforcement Standards and Education.[1]

38.    Chief Investigator Davis served in the El Paso Police Department from 1982 to 2002 where he was promoted several times to positions of high rank.

39.    He began his career as a Police Officer.  He was promoted to sergeant.  He was then promoted to lieutenant.  Subsequently, the Department promoted him to captain.  His last position was commander.

40.    Among his many different assignments as a captain and commander, he was assigned to review investigations conducted by the Department's Internal Affairs Division, and make disciplinary recommendations for officers.

41.    Chief Investigator Davis likewise managed the Bomb Squad, and was also an incident manager of the Special Weapons and Tactics (SWAT) team.

42.    Chief Investigator Davis holds a private investigator certificate for the investigations of death.  He also holds a certificate for apprehending bail fugitives.

43.    He further holds certificates for Master Peace Officer, Advanced Peace Officer, Intermediate Peace Officer, and Basic Peace Officer.  In sum, he has received more than 5,700 in law enforcement training and education.

### RETIRED COMMANDER DAVIS CONDUCTS LENGTHY INVESTIGATION

44.    Upon retention, Chief Investigator Davis and his associates combed through the surrounding neighborhood of the shooting, going house to house to interview witnesses.[2] –

45.    On June 9, 2013, he went to the address of Dolores Presock.  According to Presock, she heard a man yelling, and then a gunshot.  When she opened her front door, she saw Bernie fall to the ground.

---

[1] Exhibit "A," *Curriculum Vitae* of Roy Davis, Jr.
[2] Exhibit "B," Report Summary of Advocate Investigations Re:  Bernardo Morales (Deceased).

Plaintiffs' Original Complaint

46.     When Bernie fell to the ground, he did not have a knife or any weapon in his hands, according to Ms. Presock.

47.     Prescock further elaborated in a sworn statement:

> After the man who died fell, I could see his legs kicking.  I believe he was dying right then and there.  The officer just stood there and did not assist the man in any way.

> From the point where I saw everything, I did not see anything, weapons, or anything else in the man's hands.  It seemed to me that that the police officer and man were very far apart and that it wasn't necessary for the man to be killed.[3]

48.     On June 10, 2013, Davis met with resident Rene Torres.  Mr. Torres said he heard a loud voice, but was unable to decipher its content.  He then distinctly heard the voice say, "Come here, I want to talk to you."[4]

49.     Mr. Torres then looked outside his front door.  He stated that he then saw "a uniformed EPPD Officer pointing his gun at another male."  According to the witness, the male was walking forward with his hands in the air toward the officer.

50.     "The male had his hands up just above his head," Mr. Torres stated under oath. "I did not see anything in the male's hands."

51.     Officer Gomez had commanded Morales to walk to him, and then told him to stop, according to Torres.  Despite the ambiguity of statements, Gomez then "fired one round" at the unarmed Morales, according to Mr. Torres.

52.     Resident Guadalupe Hernandez likewise indicated that Morales was unarmed, and was being followed by the officer who was then about 35 yards behind him.[5]

53.     On June 14, 2013, Chief Investigator Davis met with resident Rosa Elvia Cruz.

---

[3] Exhibit "C," Sworn Statement of Dolores Presock.
[4] Exhibit "D," Sworn Statement of Rene Torres
[5] Exhibit "E," Sworn Statement of Guadalupe Hernandez.

According to Ms. Cruz, she saw a uniformed police officer shoot an unarmed man.

54.    Ms. Cruz stated she did not see a knife or any other weapon in Bernie's hands.

55.    On June 16, 2013, Chief Investigator Davis met with Maria Guadalupe Elias, she stated that she likewise saw the shooting on the canal.

56.    Ms. Elias likewise stated that she did not see a knife or weapons in the hands of the deceased.

57.    Chief Investigator Davis interviewed several other witnesses who likewise stated that at and near the time of the shooting, Bernie Morales was unarmed.

## CHIEF INVESTIGATOR DAVIS ANALYZES THE POLICE REPORTS AND WITNESS STATEMENTS

58.    According to Chief Investigator Davis, "The publically available documents are very general and do not provide enough information to determine whether or not the deadly force used by the officer was justified."[6]

59.    As a result, Chief Investigator Davis conducted his own investigation, which yielded radically different results.

60.    The independent investigator focused on the property inventory list in particular. He notes:

> What is of interest is that the weapon (knife) which was allegedly in the hand(s) of the deceased, is listed on the property/evidence list under 6/19/13—four days after the date of the occurrence which raises the question of when and where it was actually found and/or processes (sic) and whether or not fingerprints belonging to the deceased were found on it.[7]

61.    Investigator Davis noted something else equally disturbing about the Department's assertion that Morales was armed. He emphasizes that "none of the civilian eye-

---

[6] Exhibit "B" at 3, Report Summary of Advocate Investigations Re: Bernardo Morales (Deceased).
[7] Id.

witnesses" who were interviewed or provided statements said they saw a knife "or any other weapon or object that could be mistaken for or used as a weapon."

### FORMER EPPD COMMANDER:
### OFFICER GOMEZ 'UNJUSTIFIABLY USED DEADLY FORCE'

62.     On March 2, 2014, Chief Investigator Davis prepared his report.

63.     Relying on decades of his experience in law enforcement, more than 5,000 hours in training in law enforcement, several interviews, and witness statements, the former SWAT supervisor expressly concludes that *Bernie Morales was shot __unjustifiably__.*

64.     Specifically, the retired commander concluded in his report signed on March 2, 2014:

> Based on the information available at the time of this writing: sworn statements provided by numerous eye-witnesses as well as inconsistencies in the available police report(s), *it is the investigator's opinion that the involved police officer unjustifiably used deadly force* by discharging his firearm and causing the death of Mr. Morales in the *absence of clear and articulable facts that the officer or a third party was in imminent danger* of death or serious bodily injury. (Emphasis added.)[8]

65.     Chief Investigator Davis explains further that the Defendant Gomez was not confronted with clear and articulable facts that Defendant or any third party was in "imminent danger of death or serious bodily injury."[9]

66.     "Furthermore, Mr. Morales, according to witness accounts, was simply attempting to flee the officer/area and was not reported to be engaging in any conduct that would pose a danger to the public."[10]

67.     "If in consideration of the aforementioned, if the officer still believed Mr. Morales to be a danger, the officer could have summoned additional officers and, pending their

---

[8] *Id.*
[9] *Id.*
[10] *Id.*

arrival, maintained a safe watch of Mr. Morales."[11]

68.     The retired commander of the El Paso Police Department determined that Defendant Albert Gomez did precisely the wrong thing.

> Instead, the involved officer created a situation where he passed Mr. Morales and then approached him from the front. Versus the advantageous position of a rear approach (pursuant to police training on how to safely approach suspects), gave verbal commands for Morales to come to him, *and then fired upon Mr. Morales when was complying with the officer's commands.* (Emphasis added).[12]

## OFFICER GOMEZ HAD NO REASONABLE BASIS
## TO SHOOT BERNIE MORALES

69.     At all times relevant to his encounter with Defendant, Bernie Morales was unarmed.

70.     At all times relevant to this incident, Bernie Morales had not been placed under arrest.

71.     At all times relevant to his encounter with Defendant, Bernie Morales did not resist arrest.

72.     At all times relevant to his encounter with Defendant, Bernie Morales did not evade arrest.

73.     At all times relevant to this encounter, Bernie Morales was not suspected of committing a crime of violence.

74.     At all times relevant to this encounter, Bernie Morales had not threatened Defendant or any third party.

75.     At all times relevant to this encounter, there were no exigent circumstances to threaten Bernie Morales with deadly force.

---

[11]*Id.*
[12]*Id.*

76.     Decedent Bernie Morales complied with the Defendant's verbal commands.

77.     Defendant employed deadly force against Plaintiff.

78.     Defendant was acting under color of law when she used force against decedent.

79.     Defendant knew that Plaintiff was unarmed, and not resisting because he had his hands in the air.

80.     Defendant knew that Plaintiff was surrendering because he had his hands in the air.

81.     Defendant manifested conscious indifference firing at Plaintiff when he had his hands in the air.

82.     Discharging a firearm at an individual is a show of deadly force.

83.     The use of deadly force in this instance was unreasonable.

84.     Defendant knew or should have known that the use of deadly force in this instance was unreasonable.

85.     Defendant violated Plaintiff's Fourth Amendment rights.

**NO REASONABLE OFFICER COULD POSSIBLY BELIEVE THAT
DEFENDANT'S USE OF FORCE WAS JUSTIFIABLE**

86.     Defendant Gomez's actions of shooting Plaintiff Walker were deliberate, malicious, and exercised with a wanton/reckless disregard for the Plaintiff's constitutional rights.

87.     Fourth Amendment jurisprudence has clearly established that police officer cannot use deadly force upon an unarmed suspect who is not showing signs of active resistance.

88.     The force utilized by Officer Gomez was excessive and, thus, constituted an unreasonable seizure of Plaintiff in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

89.     Defendant's actions constituted an unlawful deprivation of Plaintiff's liberty

without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

## USE OF DEADLY FORCE ON AN UNARMED PERSON IS A CLEARLY ESTABLISHED CONSTITUTIONAL VIOLATION

90.    In *Tennessee v. Garner*, the Supreme Court held that, "The use of deadly force to prevent the escape of all felony suspects, *whatever the circumstances*, is constitutionally unreasonable."[13]

91.    The Court emphasized that "[T]he fact that [Plaintiff] was a suspected burglary could not, without regard to other circumstances, automatically justify the use of deadly force.[14]

92.    The Fifth Circuit has repeatedly relied on *Tennessee v. Garner* in holding that the use of deadly force on an unarmed individual is a clearly established violation of the individual's Fourth Amendment rights.[15]

93.    In *Sanchez v. Fraley*, where a police officer shot a fleeing suspect in a double homicide after hearing on the police radio that the suspect had a gun and had forcibly attempted to enter somebody's house,  the Fifth Circuit looked to *Tennessee v. Garner* once again, and stated that

> [I]t was clearly established well before that date [August 23, 2007] that "deadly force violates the Fourth Amendment *unless* 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'"[16]

94.    In *Sanchez v. Fraley*, the police officer had further testified that the suspect was

---

[13] *Tennessee v. Garner*, 471 U.S. 1, 12 (1985) (emphasis added).
[14] *Tennessee v. Garner*, 471 U.S. at 21.
[15]*Sanchez v. Fraley*, 376 Fed. Appx. 449, 453 (5th Cir. 2010) (unpublished); *Hobart v. City of Stafford*, Not Reported in F.Supp.2d 2010 WL 3894112 (5th Cir. 2010) (unpublished); [15] *Echols v. Gardiner*, No. H-11-0882, 2013 WL 6243736, slip op. (S.D. Tex. 2013) (unpublished); *Davis v. Montgomery Cnty.*, ___ F.Supp.2d ___, No. H:07-505, 2009 WL 1226904 (S.D. Tex. 2009) (unpublished).
[16] *Sanchez v. Fraley*, 376 Fed. Appx. 449, 453 (5th Cir. 2010) (unpublished) (emphasis in original).

digging in his waistband and pointing his hands under his shirt, as though aiming a weapon.[17]

95.    In *Davis v. Montgomery*, The United States District Court for the Southern District of Texas (Houston Division), also relied in *Tennessee v. Garner* in stating:

> The Supreme Court has held that "it is unreasonable for an officer to "seize an unarmed, nondangerous suspect by shooting him dead."
>
> [T]he principle stated above, that 'a police officer may not seize an unarmed, nondangerous suspect by shooting him dead" has long been clearly established.
> Fifth Circuit law is clear that "an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased.[18]

96.    The Houston Court continued to rely on *Garner* in *Hobart v. City of Stafford*, in making decision regarding qualified immunity, and stated that

> In 2009, when [Plaintiff's] shooting death occurred, it was clearly established that " 'deadly force violates the Fourth Amendment unless the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'"[19]

## CAUSES OF ACTION AGAINST DEFENDANT ALBERT GOMEZ

## VIOLATION OF CONSTITUTIONAL RIGHTS

97.    The factual allegations contained in all of the paragraphs of this First Amended Complaint are hereby incorporated and re-alleged for all purposes and incorporated herein with the same force and effect as if set forth verbatim.

98.    Defendant Gomez willfully and maliciously shot Bernie Morales with her firearm, despite having no legitimate reasons for doing so.

---

[17] *Sanchez v. Fraley*, 379 Fed. Appx. 449 at 452.
[18] *Davis v. Montgomery Cnty.*, ___ F.Supp.2d ___, No. H:07-505, 2009 WL 1226904 at *4-5 (S.D. Tex. 2009) (unpublished).
[19] *Hobart v. City of Stafford*, ___ F.Supp.2d ___, No. 4:09-cv-3332, 2010 WL 3894112 at *8 (S.D. Tex. 2010) (unpublished).

99.     The force used by Defendant was recklessly excessive and caused Plaintiff serious bodily injury.

100.    Defendant Gomez's exercise of established policies and customs violated Plaintiffs' clearly established rights under the United States Constitution to:

    a.      freedom from unreasonable seizure;

        i.      by shooting Bernie Morales who was unarmed;

        ii.     by shooting Bernie Morales who was not resisting;

        iii.    by shooting Bernie Morales who had committed no criminal offense;

        iv.     by shooting Bernie Morales who had not evaded arrest;

        v.      by shooting Bernie Morales who had surrendered to a show of lawful authority.

    b.      freedom from the use of unreasonable, unnecessary, and excessive force;

        i.      by shooting Bernie Morales who was unarmed;

        ii.     by shooting Bernie Morales who was not resisting;

        iii.    by shooting Bernie Morales while he had his hands in the air;

        iv.     by shooting Bernie Morales who had committed no criminal offense;

        v.      by shooting Bernie Morales who had not evaded arrest;

        vi.     by shooting Bernie Morales who had surrendered to a show of lawful authority.

    c.      and the right to medical care for injuries received while in custody;

        i.      by not calling 911 or emergency medical services after shooting Bernie Morales;

        ii.     by delaying contacting EMS after shooting Bernie Morales; and

iii.     by handcuffing Bernie Morales after he had been shot.

101.   Alternatively, Defendant Gomez violated established policies and customs of the El Paso Police Department, and likewise violated Plaintiffs' clearly established rights under the United States Constitution to:

    a.   freedom from unreasonable seizure;

       i.     by threatening deadly force when the facts did not warrant them;

      ii.     by drawing his weapon on a cooperative subject;

    iii.     by drawing his weapon on subject with his hands in the air;

    iv.     by confronting a subject from the front rather than rear;

      v.     by escalating a conflict needlessly;

    vi.     shooting Bernie Morales who was unarmed;

   vii.     by shooting Bernie Morales who was not resisting;

  viii.     by shooting Bernie Morales who had committed no criminal offense;

    ix.     by shooting Bernie Morales who had not evaded arrest;

     x.     by shooting Bernie Morales who had surrendered to a show of lawful authority.

    b.   freedom from the use of unreasonable, unnecessary, and excessive force;

       i.     by threatening deadly force when the facts did not warrant them;

      ii.     by drawing his weapon on a cooperative subject;

    iii.     by drawing his weapon on subject with his hands in the air;

    iv.     by confronting a subject from the front rather than rear;

      v.     by escalating a conflict needlessly;

    vi.     shooting Bernie Morales who was unarmed;

vii.    by shooting Bernie Morales who was not resisting;

viii.   by shooting Bernie Morales who had committed no criminal offense;

ix.     by shooting Bernie Morales who had not evaded arrest;

x.      by shooting Bernie Morales who had surrendered to a show of lawful authority.

c.  and the right to medical care for injuries received while in custody

i.      by not calling 911 or for emergency medical services after shooting Bernie Morales;

ii.     by delaying calling 911 or for emergency medical services after shooting Bernie Morales;

iii.    by doing nothing to aid Bernie Morales after shooting him; and

iv.     by delaying contacting EMS after shooting Bernie Morales.

## CAUSES OF ACTION AGAINST JOHN DOES

### A.  CONSPIRACY TO VIOLATE DECEDENT'S FOURTH AMENDMENT, SEVENTH AMENDMENT AND FOURTEENTH AMENDMENT RIGHTS

102.    Plaintiffs specifically plead all actionable conspiracy claims pursuant to 42 U.S.C. § 1985(2).

103.    Plaintiffs plead that one or more of these additional John Does conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice owed to decedent and Plaintiff through their lawful prosecution of his Fourth Amendment claims, and thus further denying them his rights to a civil jury trial as provided under the Seventh Amendment, to equal protection of the laws under the Fourteenth Amendment, or to injure decedent and Plaintiffs or their property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws.

104.   In the aftermath of this incident, there were many unexplained delays that resulted from either (a) falsification of evidence, (b) concealment of evidence, and/or (c) willful failure to investigate.

105.   These acts would have been committed by one or more individuals whose identities are presently unknown to Plaintiffs.

106.   Chief Investigator Davis has already identified that the knife alleged by the El Paso Police Department was not shown to have been booked in by the Department on the date of the incident.  Plaintiffs thus expressly plea a cause of action against all presently unidentified parties for impeding, obstructing or defeating Plaintiffs' rights who would have falsely asserted that any knife or weapon was recovered from Bernie Morales or his body at the time of this incident.  Plaintiffs thus expressly plea a cause of action against all presently unidentified parties for impeding, obstructing or defeating Plaintiffs' rights who would have placed the knife or any other weapon on or near the body of Bernie Morales.

107.   Chief Investigator Davis opined that that an inordinate amount of time has passed for a report from a report or finding from the El Paso Police Department's Shooting Review Team.  Based on this delay alone, Plaintiffs thus plead that one or more of these additional John Does conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice owed to decedent and Plaintiff through their lawful prosecution of his Fourth Amendment claims, and thus further denying them to equal protection of the laws, or to injure decedent and Plaintiffs or their property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws.

108.   Chief Investigator Davis likewise opined that that an inordinate amount of time passed for the presentation to the El Paso District Attorney's office for review or presentation to

a grand jury.  Chief Investigator Davis opined that that an inordinate amount of time has passed

for a report from a report or finding from the El Paso Police Department's Shooting Review

Team.  Based on this delay alone, Plaintiffs thus plead that one or more of these additional John

Does conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner,

the due course of justice owed to decedent and Plaintiff through their lawful prosecution of his

Fourth Amendment claims, and thus further denying them to equal protection of the laws, or to

injure decedent and Plaintiffs or their property for lawfully enforcing, or attempting to enforce,

the right of any person, or class of persons, to the equal protection of the laws.

### B.  ACTION FOR NEGLECT TO PREVENT PLAINTIFFS EXERCISING THEIR CONSTITUTIONAL DF

109.    Plaintiffs reallege and incorporate all preceding paragraphs.

110.    Plaintiffs specifically plead a cause of action under 42 § 1986 against all John

Does.

111.    Plaintiffs plead that one or more of these John Does had knowledge of the

wrongs conspired to be done including but not limited to the following:

    a.     falsifying, concealing, or manufacturing evidence,

    b.     obstruction, impeding, hindering, or otherwise defeating Plaintiffs' rights under the Fourth, Seventh and Fourteenth Amendments.

### CAUSES OF ACTION THE CITY OF EL PASO

112.    Plaintiffs reallege and incorporate all preceding paragraphs.

113.    Plaintiffs would show that the City of El Paso ratified all of the Defendants acts

as none of the officers involved have been appropriately disciplined for their role in this action.

114.    Plaintiffs would further show that the City of El Paso failed to train Albert Gomez properly in the use of firearms.  This failure and this policy proximately caused the death of Bernie Morales.

## DAMAGES

115.    Decedent Bernie Morales was killed during this incident.  Evidence indicates that he bled to death, and suffered conscious pain for an extended period of time that exceeded several minutes.

116.    As a consequence of Defendants' wrongful acts as described above, Plaintiffs have suffered actual and consequential damages exceeding the minimum jurisdictional limits of this Court.

117.    As a direct and proximate result of Defendants' acts and omissions as heretofore alleged, Bernie Morales suffered physical impairment, excruciating pain, mental anguish, medical treatments and death.  The estate is therefore entitled to recover all reasonable and necessary medical and funeral expenses incurred for the care, treatment and burial of Ruddy Elizondo that resulted from the tortious acts of Defendants.  In addition, the Estate of Ruddy Elizondo has an action for the injuries suffered, including but not limited to the disfigurement, humiliation, past pain and suffering, mental anguish and physical capacity suffered as a result of the incident.

118.    Furthermore, as the only son of decedent, Plaintiff Manny Morales, has suffered wrongful death damages for his individual (1) pecuniary loss, (2) mental anguish, (3) loss of companionship and society and (4) loss of inheritance.  Such damages include but are not limited to past and future lost earnings, past and future mental anguish damages, and other actual and consequential damages that are determined under trial of the merits.

## EXEMPLARY DAMAGES

119.    Plaintiff expressly incorporates and realleges the facts and statements previously made in all foregoing paragraphs.

120.    Plaintiff would further show that the acts and omissions of Defendants complained of herein were committed with malice or reckless indifference to the protected rights of the Plaintiff.

121.    The law is absolutely clear that deadly force is not to be employed simply because a felon is fleeing.

122.    In order to punish said Defendants for engaging in unlawful vicious attacks, and to deter such actions and/or omissions in the future, Plaintiff also seeks recovery of exemplary damages from Defendant.

123.    Furthermore, one or more of the Defendants delayed, or otherwise impeded the lawful investigation of this matter, and impaired Plaintiffs' rights.  To punish said Defendants for engaging in unlawful vicious attacks, and to deter such actions and/or omissions in the future, Plaintiff also seeks recovery of exemplary damages from such Defendants.

## ATTORNEYS' FEES

124.    Plaintiffs are further entitled to receive their reasonable attorneys' and expert witness fees pursuant to 42 U.S.C. § 1988.

## JURY DEMAND

125.    Plaintiffs respectfully demands that this action be tried before a jury.

## CONCLUSION

126.    Plaintiffs respectfully urge that the Defendants be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Plaintiffs against the Defendants for damages in an amount within the jurisdictional limits of the Court; exemplary damages, attorneys' fees; together with pre- and post-judgment interest as allowed by law; costs of court; and such other further relief to which the Plaintiffs may be entitled at law or in equity.

Respectfully submitted,

By: _____

Geoff J. Henley
Texas Bar No. 00798253
ghenley@henleylawpc.com
R. Lane Addison
Texas Bar No. 00798253
rladdison@henleylawpc.com

**HENLEY & HENLEY, P.C.**
3300 Oak Lawn Avenue, Suite 700
Dallas, Texas  75219
Telephone #:  (214) 821-0222
Facsimile #:  (214) 821-0124

**ATTORNEYS FOR PLAINTIFFS**
**MANNY MORALES, INDIVIDUALLY,**
**AND LOURDES MORALES,**
**REPRESENTATIVE OF THE ESTATE**
**OF BERNIE MORALES**



# *Curriculum Vitae*

## *(Criminal Justice)*

Roy Davis, Jr.

Email: advocateinvestigativesvcs@yahoo.com

Place of Birth:   Fairbanks, Alaska
Citizenship:      US Citizen
Gender:           Male

Roy Davis, Jr. is the President/CEO and Chief Investigator of Advocate Investigations. A certified Peace Officer in good/current standing and retired Police Commander of a large municipal police agency, he brings a wealth of experience from all levels of police and investigative services from line-level to top management-level. Roy Davis, Jr. is an accomplished police practitioner who can provide detailed insight into: law-enforcement reasoning; policies; practices; training; and methods as it applies to criminal allegations or law-enforcement misconduct. Having presented evidence and testimony in civil and criminal cases at Justice of the Peace, County, State/District, and Federal Court levels, he is no stranger to the court room. Roy Davis, Jr. is also a team-builder and team- coordinator with the attributes to accomplish large-scaled projects/plans development and management. Evidenced during his tenure as a member of Dignitary Protection entrusted with the protection of dignitaries from Mayors to the Vice President of the United States, he successfully executed presidential security plans, as well as other numerous city-wide community action plans.

1

PLAINTIFF'S EXHIBIT
A

**Employment History:**

## Advocate Services, Inc.

| | |
|---|---|
| Tenure: | 2008-Present |
| Subsidiaries: | Advocate Investigations TXDPS Lic#A15096 and Advocate Process Services |
| Position(s): | President/CEO/Chief Investigator |
| Duties: | Manage Operations, Personnel, and Budgets. Assist Field Investigators with cases and surveillance and testify in Court proceedings. |
| History: | Advocate Services, Inc. was founded in 2008 by sole proprietor, Roy Davis Jr., to meet the industry demands for investigations and civil process service. After lengthy research via observation and surveys, it was determined that the industry was comprised of several small companies, employing only a few people who easily became overwhelmed under large volume demands. Roy Davis Jr. applied a different yet well-known philosophy when creating Advocate Services, Inc. by employing a very large team of individuals whereby developing a firm capable of handling large volume demands with minimal delays and errors. Advocate Services, Inc. has rapidly earned the reputation as a very capable firm as evidenced by being sought out to complete assignments for the County of El Paso, Texas and the West Texas Federal Courts as appointees, as well as, being retained by several private independent attorneys and large well-known law firms. Advocate Services, Inc. performs general investigations for both criminal and civil type cases but has expertise in the areas of Juvenile Investigations (status offenses and children in need of supervision) and Traffic Investigations (Collision investigations/reconstruction, safety studies, DWI defense). Roy Davis Jr. has been qualified as an expert witness in several trial cases in County, State, and Federal Courts. |

| | |
|---|---|
| Associations/Memberships: | TALI: Voting member of Texas Association of Licensed Investigators |
| | NAIS: Member of National Association of Investigative Specialists |

## El Paso Police Department

| | |
|---|---|
| Tenure: | 1982-2002 |
| Positions: | Police Officer, Detective, Sergeant, Lieutenant, Captain, and Commander |
| Duties: | Public Safety, Investigations, Manage Operations, Personnel, and Budgets (General Funds, Confiscated Funds, and Grants). |

History:  **Commander/Captain**: Managed general budget, confiscated funds budget, and grants assigned to my division, as well as personnel, and operations of:

Traffic Enforcement – Freeway Patrol (IH10, US54, Loop 375 Corridors), DWI Task Force (citywide) and STI (Special Traffic Investigations).  Created Aggressive Driving Task Force (Road Rage) by: authoring the curriculum/lesson plan and conducting the training; designing the task force vehicles (equipment and markings); and evaluating and the pilot program prior to full implementation.

Airport Security and Aviation/Air Support – Managed El Paso International Airport Security. Ensured patrol coverage of airport property by patrol officers in accordance with FAA regulations. I managed the Aviation/Air Support Unit which consisted of: pilots; spotters; and supervisors. I was also responsible for purchasing and maintenance of fixed-winged air planes and helicopters.

Canine (K9) – Managed Canine Section which provided K9 services for entire city and El Paso International Airport. I was responsible for training, purchasing, certifications, etc. of the officers and animals of this unit.

Bomb Squad – Managed personnel, training, and equipment.

Mountain Rescue Team – Managed personal, training, and equipment.

SWAT/CMT – Managed personnel, training, and equipment. I was also the Incident Commander and managed the Command Post during SWAT/CMT scenes.

Training Academy – Managed personnel, equipment, and facilities and ensured current in-service training status/records were maintained for 1100+ sworn officers, as well as, recruitment and pre-service training needs for new officers were being met.

Discipline Review – Assigned to review investigations completed by Internal Affairs Division and make a discipline recommendation to the Chief of Police.

Chaplain Corp – Managed Volunteer Chaplain Program with consisted of twelve area clergy. Created a policy manual and designed their uniforms.

Liaisons -   Mayor/City Council: Attended weekly meetings and served as – representative in all agency-related matters.

Pride Day: Organized annual citywide community cleanup day with citizens, vendors, groups, and other city government departments.

TMRA: Served as liaison between the agency and the Texas Motorcycle Rights Association.

3

MPO: Served as voting member on the Metropolitan Planning Organization Committee.

*Lieutenant:* Managed federal and state grants, personnel, and operations of:

Traffic Enforcement – Freeway Patrol (IH10, US54, Loop 375), DWI Task Force, and STI (Special traffic Investigations)

Special Operations – Regional Command Lieutenant managing: regional traffic enforcement/complaints; community services; Police Area Representatives (PAR) to address regional quality of life issues.

Patrol Shift Commander – Regional Command Lieutenant managing three Sergeants and patrol squads to answer radio calls.

Liaisons -     EPLRA: Attended monthly meetings with El Paso Low Riders Assoc.
               TCAB: Co-chair of Traffic Citizens Advisory Board
               WSRCCAB: Attended monthly meetings of West Side Regional
               Command Citizens Advisory Board.

*Sergeant:* Supervised personnel, and operations of:

Community Services – DARE and other educational programs, SRO (School Resource Officer), program designed to target under-privileged/at-risk youth.

PAR (Police Area Representatives )-A section of officers who respond to neighborhood complaints and other quality-of-life issues and work with the involved parties to reach long-term/permanent solutions.

Patrol Shift Supervisor – Supervised a shift of patrol officers who responded to general calls for service and conduct preliminary investigations.

*Detective:* Conduct Investigations, serve as lead investigator, complete cases, present cases to appropriate agency: District Attorney, County Attorney, Juvenile Probation Dept., etc.

CAP – Crimes Against Persons. Assigned primarily to Robberies but also assisted in sexual assault, family violence, and homicide investigations.

IAD  - Conducted administrative and criminal investigations for Internal Affairs Division involving complaints against police personnel. Investigations included locating and interviewing witnesses-obtaining statements, locating and collecting/photographing

evidence, and completing case summaries.

<u>YSD</u> – Youth Services Division. Conducted investigations regarding crimes involving juvenile offenders and victims. Investigated all offenses: assaultive, sex, robbery, property, abuse, etc. Worked with Texas Youth Commission, Juvenile Probation Department, and Child Protective Services.

*Police Officer:* Respond to calls for service, conduct preliminary investigations.

<u>YSD</u> – Youth Services Division. Responded to calls involving juveniles and conducted preliminary investigations which could lead to a custodial referral to Juvenile Probation Department or a request for further investigation by a Detective. Also investigated Runaways/missing juveniles.

<u>Traffic Enforcement</u> – Worked freeway patrol by enforcing movement and speed laws. Prior to freeway assignment, worked as a DWI Task Force officer who sought and apprehended suspected impaired drivers. Obtained certifications in Standardized Field Sobriety Testing and Traffic Radar. Investigated traffic collisions involving no or minor injuries to serious injuries or death.

<u>Patrolman</u> – Responded to general calls for service and conducted preliminary investigations.

### Professional Certifications:

Death Investigation for the Private Investigator - Certificate

Apprehending Bail Fugitives – Certificate

Certified Radar Operator-Certificate

Standardized Field Sobriety Tests – Certificate

Traffic Investigations – Intermediate Certificate

Traffic Accident Reporting – Certificate issued by Texas Traffic Safety Institute (Texas A & M University)

Child Abuse Prevention &  Investigation - Certificate

Certified Instructor – Certificate issued by Federal Bureau of Investigations

Master Peace Officer – Certificate issued by TCLEOSE

Advanced Peace Officer – Certificate issued by TCLEOSE

Intermediate Peace Officer – Certificate issued by TCLEOSE

Basic Peace Officer – Certificate issued by TCLEOSE

## Publications:

Police Radar Article in "Beacon" Public Safety Publication

"Aggressive Driving Enforcement" training and policies manual

## Education and Professional Training:

Roy Davis, Jr. amasses more than 5,700 training hours in law and law enforcement and 192 cumulative college hours from:

University of Phoenix

Park College/University

University of Texas at El Paso

El Paso Community College

Leadership and Development (1-year series) by: IACP (International Association of Chiefs of Police

Command Staff Leadership Series by: LEMIT (Law Enforcement Management Institute of Texas)

Critical Incident Stress Management Training by: Texas Bureau of Emergency Management

Incident Command System by: Emergency Response Institute, Inc.

Family Violence Concepts by: El Paso Police Training Division

Ethics for Peace Officer by: Office of the Texas Attorney General



# *Advocate Investigations*
## *and Process Serving, Inc.*
### P.O. Box 640536 El Paso, Texas 79904
### Telephone/Fax (915) 757-6626
### TXDPS# A15096

## *Summary*

Re:   Bernardo Morales (Deceased)
      Alleged Offense: Homicide (Law Enforcement Related)

The undersigned affiant, Chief Investigator Roy Davis, licensed under Texas Department of Public Safety Private Security Bureau, License #A15096, was retained for the purpose of fact-finding regarding the reported events in the above referenced case. The investigation was conducted as chronicled:

June 9, 2013 at 7:30 PM at the address of 8479 Alameda #407, a face-to-face interview with Dolores Presock. Ms. Presock stated that with regards to the above-referenced incident, she heard a male yelling "get down, get down" and then immediately followed by a single gunshot. She openedher front door, looked towards the canal, and observed the deceased fall to the ground. She stated that she did not see a knife or any other weapon in the hands of the deceased. She submitted a sworn written statement which accompanies this summary.

June 10, 2013 at 10:25 AM at the address of 8479 Alameda #301, a face-to-face interview with Rene Torres was conducted. Mr. Torres stated that with regards to the above-referenced incident, he heard a male yelling but was unable to decipher what was being said. He then heard the male say "come here, I want to talk to you." Mr. Torres advised that he looked out his front door towards the canal and observed a uniformed EPPD Officer pointing his gun at another male. The male was walking towards the officer with his hands in the air. Mr. Torres stated that he did not see a knife or any other weapon in the hands of the deceased. The officer yelled "stop, stop" and then fired a single gunshot which struck the male. He submitted a sworn written statement which accompanies this summary.

June 10, 2013 at 11:45 AM at the address of 8479 Alameda #310, a face-to-face interview with Guadalupe Hernandez was conducted in Spanish. Ms. Hernandez stated that with regards to the above-referenced incident, she looked out of her bedroom window and saw a male walking northbound on the canal with a marked EPPD car following behind him. When Ms. Hernandez observed the deceased, he was walking with his hands down by his side and she did not see a knife or any other weapon in the hands of the deceased. She submitted a sworn written statement which accompanies this summary.



PLAINTIFF'S
EXHIBIT

B

June 14, 2013 at 6:55 PM AM at the address of 194 Prado Road, a face-to-face interview with Rosa Elvia Cruz was conducted. Ms. Cruz used to reside at 8479 Alameda #301. Ms. Cruz stated that with regards to the above-referenced incident, she saw a uniformed policeman shoot the deceased on the canal. She stated that she did not see a knife or any other weapons in the hands of the deceased. She submitted a sworn written statement which accompanies this summary.

July 16, 2013 at 8:00 PM at the address of 8479 Alameda #301, a face-to-face interview with Maria Guadalupe Elias was conducted in Spanish. Ms. Elias stated that with regards to the above-referenced incident, she saw a police officer shoot a male on the canal. She stated that she did not see a knife or any other weapons in the hands of the deceased. She submitted a sworn written statement which accompanies this summary.

July 17, 2013 at 6:30 PM at the address of 8479 Alameda #405, a face-to-face interview with Josefina Hernandez was conducted in Spanish. Ms. Hernandez stated that with regards to the above-referenced incident, she was standing outside of her home along with her daughter-in-law; Hermina Hernandez, when she saw a marked EPPD car driving along the canal, following a male. The police car stopped and then the officer positioned himself in front of the male. She stated that the male was walking towards the officer and did not have a knife or any other weapons in his hands. Ms. Josefina Hernandez then stated that she heard the officer say "stop" several times and then the single gunshot. That is when she observed the male fall to the ground. Ms. Josefina Hernandez did not wish to provide a written statement. Investigator George Martinez, who conducted the interview, submitted a sworn statement to the aforementioned which accompanies this summary. Ms. Josefina advised that her son and daughter-in-law: Alfonso Hernandez and Hermina Hernandez reside in California and were visiting when this incident occurred.According to Ms. Josefina Hernandez, Alfonso was inside and did not witness event, however, Hermina was outside when it happened. Josefina Hernandez verified the telephone number for Hermina.

August 5, 2013 at 10:30 AM at the address of 8479 Alameda #409, a face-to-face interview with Manuel Lucero was conducted. Mr. Lucero stated that with regards to the above-referenced incident, he saw the male walking on the canal with a marked EPPD car following. The police car sped ahead and stopped. The officer exited the car and told the male that he only wanted to talk. The male turned around and proceeded to walk away from the officer. The officer then crossed over the canal at a point he was able to, and followed behind the male on foot. The officer repeated that he only wanted to talk. The male then turned around and walked towards the officer at a face pace. The male had his hands in the air. Mr. Lucero stated that he heard the officer say "drop the gun, put down, drop the knife." Mr. Lucero stated that it appeared as if the male had something in his left hand, but he could not say for certain what it was. Mr. Lucero stated that when the male was about ten feet away from the officer, the officer fired a single shot. He submitted a sworn written statement which accompanies this summary.

September 8, 2013 at 8:08 PM, after several failed attempts to reach Hermina Hernandez, Chief Investigator Roy Davis made telephone contact with her via (661) 823-8319. Hermina Hernandez advised that she had already provided a statement to the police on the day it happened and did not wish to give another interview/statement.

Chief Investigator Roy Davis made numerous unsuccessful attempts to contact Larry Davis at 8536 Winchester (listed in the EPPD report as a witness). It is believed that he may be the person who made the initial call to summon the police. Access to the front door of the single-family dwelling is restricted by a fence and secured gate. Several business cards were left on the gate but none resulted in a call back.

October 4, 2013 at 2:15 PM at the address of 8536 Winchester, the investigator attempted to contact Mr. Larry Davis (listed in the EPPD report as a witness). The investigator was still unable to gain access to the front door but left his business card on the windshield wiper of a vehicle parked in front of the address.

October 6, 2013 at 7:15 PM, the investigator received a phone call/voice message from Mr. Larry Davis in reference to the card left on his vehicle. The investigator called Mr. Davis back and, during the phone conversation, Mr. Davis advised that he was the individual who called the police on the date of occurrence after seeing the male hanging around the canal. According to Mr. Davis, he was close enough to the male to have a brief conversation. Mr. Davis stated that the male asked if it were okay to pick some pecans to which Mr. Davis told him to go ahead. Mr. Davis stated that he did not see a knife or any other weapon in the male's possession at that time. The last time Mr. Davis saw the male was when the marled police car arrived in the area and the male took off up the alley in a manner described by Mr. Davis as an attempt to avoid the officer. The investigator requested a written statement from Mr. Davis and he agreed to meet with the investigator on Monday at his place of employment.

October 7, 2013 at 9:25 AM at the address of 8479 Alameda #405, the investigator met again with Josefina Hernandez and asked for her assistance with contacting her daughter-in-law, Hermina Hernandez to see if she would agree to an interview. The investigator observed Josefina Hernandez telephone her daughter-in-law and leave a voice message for her to call the investigator.

October 7, 2013 at 10:00 AM at the address of 8485 Alameda #A, Beto Motors, which is located in front of the address of occurrence, the investigator met with Mr. J. Sanchez and asked if he had seen or heard anything regarding this case. Mr. Sanchez stated that he had not seen nor heard anything. Mr. Sanchez went to the rear of his lot and asked a male employee if he happened to see or hear anything regarding the police-involved shooting. The employee replied no. Mr. Sanchez was asked about a young man who was working at the rear of the business during the incident and may also be a witness. Mr. Sanchez described the young man as an adolescent from Mexico who would show up occasionally and wash cars for money. The young man, whom Mr. Sanchez claimed to not know his name, did not show up on a regular schedule and was not on the payroll. According to Mr. Sanchez, the young man showed a few times after the incident but has not been seen for more than a year. Mr. Sanchez does not know how to contact the young man.

October 7, 2013 at 10:10 AM at the address of 8485 Alameda, U & S Motors, also located in front of the address of occurrence, the investigator met with Mr. J. Perez and asked if he had seen or heard anything regarding this case. Mr. Perez stated that he arrived at work that morning at around 10:00 AM, after the time of occurrence.

October 7, 2013 at 10:15 AM at the address of 8481 Alameda, Alverdy's Auto Sales, also located in front of the address of occurrence, the investigator met with Mr. Antonio Alverdy and asked if he had seen or heard anything regarding this case. Mr. Alverdy stated that he arrived at his business that morning at around 9:30 AM, after the time of occurrence.

October 7, 2013 at 11:10 AM at the address of 1875 Saul Kleinfeld (Goodwill drop off center), the investigator met with Mr. Larry Davis provided a written statement of the accounts he shared during the October 6, 2013 telephone call between him and the investigator. That statement accompanies this summary.

October 16, 2013, in an attempt to identify, locate, and interview a witness listed on the EPPD report, identified as Virginia Tullius, the investigator conducted an investigative search using public and subscribed open-source databases and found that individual to be deceased. El Paso County records reports her date of death as 01/18/2011, approximately eighteen months prior to the date of occurrence.

February 13, 2013 at 11:15 AM at the address of 8485 Alameda #A, the investigator returned and inquired if the young man who was being sought had ever returned. Mr. Sanchez advised that the young man had not.

Investigator's Opinion:

The publically available documents are very general and do not provide enough information to determine whether or not the deadly force used by the police officer was justified.What is of interest is that the weapon (knife) which was allegedly in the hand(s) of the deceased, is listed on the property/evidence list under 6/19/13 – four days after the date of occurrence which raises the question of when and where it was actually found and/or processes and whether or not fingerprints belonging to the deceased were found on it. Furthermore, the probative value of a knife or any other weapon is definitely questionable as none of the civilian eye-witnesses interviewed provided a statement that they saw it or any other weapon or object that could have been mistaken for or used as a weapon. It should be noted that all but one of the witnesses interviewed, were also interviewed by the police department during their initial investigation.

Based information available at the time of this writing: sworn statements provided by numerous eye-witnesses as well as inconsistencies in the available police report(s), it is the investigator's opinion that the involved police officer unjustifiably used deadly force by discharging his firearm and causing the death of Mr. Morales in the absence of clear and articulable facts that the officer or a third party was in imminent danger of death or serious bodily injury. Furthermore, Mr. Morales, according to witness accounts, was simply attempting to flee the officer/area and was not reported to be engaging in any conduct that would pose a danger to the public. In consideration of the aforementioned, if the officer still believed Mr. Morales to be danger, the officer could have summoned additional officers and, pending their arrival, maintained a safe watch of Mr. Morales. Instead, the involved officer created a situation where he passed Mr. Morales and then approached him from the front, verses the advantageous position of a rear approach (pursuant to police training on how to safely approach suspects), gave verbal

commands for Mr. Morales to come to him, and then fired upon Mr. Morales when he was complying with the officer's commands.

In closing, the extremely lengthy amount of time that has passed pending: a finding/report by the EPPD SRT (shooting review team); presentation of the case to the District Attorney for review; and/or presentation to the Grand Jury for review brings into question, the justification of the use of deadly force in this case.

Based on the eye-witness statements obtained during this, it is believed that entry and subsequent discovery in this case is warranted.

Prepared by:

Roy Davis, Chief Investigator
Advocate Investigations
(TXDPS License #A15096)

03/02/2014
Date

Information contained in this report includes personal data with regards to the subjects and is considered sensitive and confidential and should be treated accordingly. Advocate Investigations has been retained to conduct research and provide the findings for the purposes of legal use of this information for a pending or future litigation for Court Cause number N/A and any other use or dissemination is strictly prohibited.



# *Advocate Investigations*
## *and Process Serving, Inc.*
**P.O. Box 640536 El Paso, Texas 79904**
**Telephone/Fax (915) 757-6626**
**TXDPS# A15096**

## *Statement of Facts*

My name is **DOLORES PRESOCK** and I am **65** years of age

(DOB: **04/25/1948** ). I currently reside at **8479 Alameda #407**
**El Paso, Texas** . I am at **8479 Alameda # 407**

El Paso, Texas 799**07** on **06/09/13** at **7:30** am/pm giving this statement to Investigator

Roy Davis, a Texas State Licensed Private Investigator (Lic#A15096) on my own free will.

*D.P.* I understand that this statement may be used as any part of an investigative or judicial proceeding pertaining to this case and that I may be called to provide testimony regarding the facts provided.

*D.P.* I have not been threatened, coerced, or promised anything to include, but not limited to: anything of monetary value, special favors, etc. in exchange for me giving this statement. My account(s) of my personal knowledge of the person/incident in question is/are as follows:

LAST SUMMER, DURING THE MORNING AROUND 8:30 AM, I CANNOT RECALL THE EXACT DAY, I WAS INSIDE MY HOME WATCHING TELEVISION. I WAS IN MY TV ROOM WHICH IS IN THE FRONT OF MY HOUSE FACING THE STREET AND THE CANAL/DITCH. I HAD THE WINDOW TO THAT ROOM ABOUT HALFWAY OPENED FOR VENTILATION. *D.P.*

*D.P.*
I HEARD A MALE YELLING; "GET DOWN, GET DOWN!" I GOT UP TO GO TO LOOK OUT MY FRONT DOOR, TO SEE WHAT WAS HAPPENING. IT TOOK ME ABOUT 4 OR 5 SECONDS TO REACH MY FRONT DOOR. AT THAT MOMENT, I HEARD WHAT I BELIEVED TO BE ONE GUNSHOT. I IMEDIATELY PARTIALLY OPENED MY FRONT DOOR AND SAW A MAN STANDING FOR A SECOND OR SO AND THEN FALL ON HIS BACK. THE MAN WAS STANDING AND FACING NEAR THE POLE THAT I POINTED OUT TO INVESTIGATOR DAVIS (3RD ONE AWAY FROM THE POLE WITH THE PLASTIC BAG ON

*D.P.*

Page **1** of **2** pages.

**PLAINTIFF'S EXHIBIT**
**C**

Statement of DOLORES PRESOCK

Date/Time 6/9/13 @ 7:30pm

Continued...

D.P.

TOP. THERE WAS A POLICE OFFICER STANDING WITH HIS GUN POINTED AT THE MAN WHO HAD JUST FALLEN. THE OFFICER WAS STANDING WHERE THE MEMORIAL FOR THE MAN WHO DIED IS ATTACHED TO THE FENCE; THE DISTANCE OF A LITTLE MORE THAN THE DISTANCE OF THREE POLES OF THE CHAIN LINK FENCE BETWEEN THE TRAILER PARK PROPERTY AND THE CANAL. D.P.

D.P.

AFTER THE MAN WHO DIED FELL, I COULD SEE HIS LEGS KICKING. I BELIEVE HE WAS DYING RIGHT THEN AND THERE. THE OFFICER JUST STOOD THERE AND DID NOT ASSIST THE MAN IN ANY WAY. D.P.

D.P.

FROM THE POINT WHERE I SAW EVERYTHING, I DID NOT SEE ANYTHING WEAPONS OR ANYTHING ELSE IN THE MAN'S HANDS. IT SEEMED TO ME THAT THE POLICE OFFICER AND MAN WERE VERY FAR APART AND THAT IT WASN'T NECESSARY FOR THE MAN TO BE KILLED. D.P.

D.P.

I HAVE READ THIS STATEMENT AND, ALTHOUGH IT IS NOT MY EXACT WORDS NOR IN MY HANDWRITING, FIND IT TO BE A TRUE AND ACCURATE REPRESENTATION OF THE FACTS THAT WERE PERSONALLY WITNESSED BY ME. D.P.

Page 2 of 3 pages

Statement of _DOLORES PRESOCK_

Date/Time _6/9/13 @ 7:30 pm_

*Continued...*

_1.*_ I have read the aforementioned statement consisting of _3_ pages and attest under oath that it is true and correct to the best of my knowledge.

_Dolores Presock_
     Signature

_6.-9-13_
     Date

_Dolores Presock_
     Printed Name

Subscribed and sworn to before me on this _9_ day of _JUNE_ 20 _13_

     Notary Seal

_Roy Davis_
     Notary Public, State of Texas

```
ROY DAVIS
Notary Public, State of Texas
My Commission Expires
May 09, 2016
```



# Advocate Investigations
## and Process Serving, Inc.
P.O. Box 640536 El Paso, Texas 79904
Telephone/Fax (915) 757-6626
TXDPS# A15096

## Statement of Facts

My name is _RENE TORRES_ and I am _23_ years of age

(DOB: _02, 25, 1989_ ). I currently reside at _8479 ALAMEDA #301 EL_

_PASO, TX 79907_ . I am at _8479 ALAMEDA # 301_

El Paso, Texas 799 _07_ on _JUNE 10, 2013_ at _1025_ am/pm giving this statement to Investigator

Roy Davis, a Texas State Licensed Private Investigator (Lic#A15096) on my own free will.

_RT_ I understand that this statement may be used as any part of an investigative or judicial proceeding pertaining to this case and that I may be called to provide testimony regarding the facts provided.

_RT_ I have not been threatened, coerced, or promised anything to include, but not limited to: anything of monetary value, special favors, etc. in exchange for me giving this statement. My account(s) of my personal knowledge of the person/incident in question is/are as follows:

AROUND A YEAR AGO AT ABOUT 8:30 IN THE MORNING I WAS IN THE BEDROOM OF MY HOME. AT THE TIME, I LIVED IN TRAILER #401 WHICH IS DIRECTLY IN FRONT OF THE CANAL WHERE THE INCIDENT HAPPENED. MY BEDROOM WINDOW WAS ON THE FRONT OF THE HOUSE, PROVIDING ME A CLEAR AND UNOBSTRUCTED VIEW OF THE CANAL. THE WINDOW WAS OPENED FOR VENTILATION. AT

I FIRST HEARD A MALE VOICE YELLING. I COULDN'T UNDERSTAND WHAT THE YELLING WAS. I THEN HEARD THE MALE SAY "COME HERE, I WANT TO TALK TO YOU!" IMMEDIATELY, I WENT TO THE FRONT DOOR (ALSO FACES THE CANAL) AND LOOKED OUT. I SAW A UNIFORMED POLICE OFFICER WITH HIS GUN POINTED AT ANOTHER MALE. THE MALE WAS WALKING RAPIDLY TOWARDS THE OFFICER. THE MALE HAD HIS HANDS UP JUST ABOVE HIS HEAD. I DID NOT SEE ANYTHING IN THE MALE'S HANDS. I THEN HEARD ar

Page _1_ of _3_ pages.

PLAINTIFF'S EXHIBIT
D

Statement of _Rene Torres_
Date/Time _6/10/13_ @ _10:25 Am_
Continued...

THE OFFICER TELL THE MALE TO STOP. THE OFFICER
SAID "STOP" MULTIPLE TIMES WHILE GIVING THE
STOP MOTION WITH HIS LEFT HAND AND HOLDING HIS
GUN IN HIS RIGHT HAND. USING THE CHAIN LINK FENCE
AS A REFERENCE (THE FENCE THAT DIVIDES THE CANAL
FROM TRAILER PARK) THE MALE WAS ABOUT TWO
POLE LENGTHS AWAY FROM THE POLICE OFFICER WHEN
THE OFFICER FIRED ONE ROUND.

THE MALE FELL TO THE GROUND. HE ORIGINAL FELL ON HIS
SHOULDER (I CANNOT RECALL WHICH ONE) THEN IMMEDIATELY
ROLLED ONTO HIS BACK FACING UP. THE MALE WAS MOVING
LIKE HE WAS TRYING TO GET UP. THE OFFICER TOLD HIM
TO JUST STAY DOWN AND THE OFFICER APPEARED TO
BE MAKING CALLS ON HIS RADIO.

I HAVE READ THE ABOVE STATEMENT AND, ALTHOUGH
IT IS NOT MY EXACT WORDS NOR IN MY HANDWRITING,
FIND IT TO BE A TRUE AND ACCURATE REPRESENTATION
OF THE FACTS I PRESENTED BASE ON MY PERSONAL
OBSERVATIONS.

**Page 2 of 3 pages**

Statement of _RENE TORRES_

Date/Time _6/10/13 @ 10:25Am_

*Continued...*

☑ I have read the aforementioned statement consisting of _3_ pages and attest under oath that it is true and correct to the best of my knowledge.

_____
Signature

_04/10/13_
Date

_____
Printed Name

Subscribed and sworn to before me on this _10_ day of _JUNE_ 20_13_.

_____

Notary Seal

_____
Notary Public, State of Texas

ROY DAVIS
Notary Public, State of Texas
My Commission Expires
May 09, 2016



# *Advocate Investigations*

## *and Process Serving, Inc.*
**P.O. Box 640536 El Paso, Texas 79904**
**Telephone/Fax (915) 757-6626**
**TXDPS# A15096**

## *Statement of Facts*

My name is _GUADALUPE HERNANDEZ_ and I am____years of age

(DOB: _09_ / _21_ / _1952_ ). I currently reside at _8479 ALAMEDA #310, EL_

_PASO, TX 79907_ . I am at _8479 ALAMEDA #310_

El Paso, Texas 799_07_ on _06_/_10_/_13_ at _1145_ am/pm giving this statement to Investigator

Roy Davis, a Texas State Licensed Private Investigator (Lic#A15096) on my own free will.

_____I understand that this statement may be used as any part of an investigative or judicial proceeding pertaining to this case and that I may be called to provide testimony regarding the facts provided.

_____I have not been threatened, coerced, or promised anything to include, but not limited to: anything of monetary value, special favors, etc. in exchange for me giving this statement.  My account(s) of my personal knowledge of the person/incident in question is/are as follows:

_ABOUT A YEAR AGO, DURING THE MORNING HOURS I WAS IN MY BEDROOM OF MY HOME. THE WINDOW FACES THE CANAL THAT RUNS ALONG OUR TRAILER PARK. I LOOKED OUT THE WINDOW AND SAW A MALE WALKING ON THE TOP OF THE CANAL. HE WAS WALKING FROM TOWARDS THE DIRECTION OF THE PARK OFFICE. THERE WAS A POLICE CAR FOLLOWING HIM; ABOUT 35 YARDS BEHIND._

_THE MALE WAS WALKING WITH HIS HANDS DOWN BY HIS SIDE. I DID NOT SEE A KNIFE, WEAPON, OR ANYTHING ELSE IN HIS HANDS._

_I HAVE READ THIS STATEMENT AND, ALTHOUGH NOT IN MY EXACT WORDS NOR HANDWRITING, FIND IT TO BE A TRUE AND ACCURATE REPRESENTATION OF THE FACTS AS PERSONALLY WITNESSED BY ME._

Page _1_ of _2_ pages.





PLAINTIFF'S
EXHIBIT

**E**

Statement of *Guadalupe Hernandez*
Date/Time *06/10/2013   1145 am*
*Continued...*

*Ext 6.21*

*6.21* I have read the aforementioned statement consisting of *2* pages and attest under oath that it is true and
correct to the best of my knowledge. *TRANSlATED by Willie R. Padilla JR*

*Guadalupe Hernandez*
_____                    *6-10-13*
Signature                                                        _____
                                                                        Date

*Guadalupe Hernandez*
_____
Printed Name

Subscribed and sworn to before me on this *10* day of _____*June*_____ 20 *13*

                                                            *Roy Davis*
Notary Seal                              _____
                                                  Notary Public, State of Texas

ROY DAVIS
Notary Public, State of Texas
My Commission Expires
May 09, 2016

Page *2* of *2* pages

Court Name: TEXAS WESTERN
Division: 3
Receipt Number: 300019514
Cashier ID: vmedina
Transaction Date: 05/22/2014
Payer Name: HENLY AND HENLY PC
------------------------------------
CIVIL FILING FEE
 For: MANNY MORALES, et al
 Amount:        $400.00
------------------------------------
PAPER CHECK
 Amt Tendered:  $400.00
------------------------------------
Total Due:      $400.00
Total Tendered: $400.00
Change Amt:     $0.00

CIVIL FILING
FEE,DTXW314CV000189-001

MANNY MORALES, et al v. OFFICER A.
GOMEZ, et al

FM / MAT